UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                              Case No. 8:10-CR-298-T-30MAP

COURTNEE NICOLE BRANTLEY
_____/

## ORDER

**BEFORE THE COURT** are Defendant's verbal motions for acquittal at the close of the Government's case and at the close of all evidence upon which the Court had reserved ruling, Defendant's Motion for Judgment of Acquittal (Dkt. #246), Defendant's Amended Motion for Judgment of Acquittal (Dkt. #247), Defendant's Motion for New Trial (Dkt. #248), Defendant's Supplemental Filing to Brantley's Motion and Amended Motion for Judgment of Acquittal (Dkt. #249), the Government's Responses (Dkts. #250, #251), and the jury verdict (Dkt. #241). The Court enters this Order to resolve these motions and explain the difficulty with the facts of this case, which evoke such strong emotions, fitting the legal requirements of the crime (misprison of a felony) with which Defendant Brantley is charged.

## BACKGROUND

The facts are basically undisputed. On the night of June 29, 2010, Brantley was driving her vehicle in the city of Tampa with no license tag. Her tag had been stolen. She claimed that an individual with the tag office had told her she could drive as long as she came in as soon as reasonably practical to obtain a new tag. Her passenger was Dontae Morris.

David Curtis, a city of Tampa police officer on patrol, executed a traffic stop because of Brantley's lack of a vehicle tag. The entire incident of the traffic stop, including the shooting of two Tampa police officers, was captured on the dashboard camera of the police cruiser.

The officer approached the driver's side of the vehicle and asked Brantley to produce her driver's license, registration, and proof of insurance. After a short search in the glove compartment, Brantley handed that information to the officer and answered his questions about her lack of tag. The officer then questioned the passenger, and the passenger gave his name, Dontae Morris, and birth date. The officer wrote the information on his note pad, returned to his cruiser, and ran the name of Dontae Morris on his computer. The computer showed there was a warrant outstanding for Dontae Morris and that he had previously resisted arrest. The officer called for back up.

When the back up officer arrived, both officers approached the passenger side of the vehicle. Officer Curtis asked Morris if he knew anything about a warrant to which Morris replied in the negative. The officer asked Morris to step from the vehicle and he complied. The officers showed no sign of seeing a gun, nor can one be seen on the video. The officer then asked Morris to turn around and place his hands behind his back. At that point, Morris dipped down slightly and then, in a rapid movement, raised up with a gun in his hand. With his hand higher than the roof of the car, Morris fired point blank into the heads of the two police officers, killing them instantly. Morris started to run, stumbled, and fell. He got up and continued to run carrying his gun with him.

Brantley's reaction to this episode, after screaming at Morris, was to race from the scene, tires spinning. Within ninety seconds, Brantley was in contact with Morris by cell phone. She drove approximately three miles to an apartment complex where a friend lived and parked her car at the opposite end of the complex, backing it into a parking space. She then went to her friend's apartment. While she was there, she received a text message from Morris stating "[y]our ride dont need 2 be park by the spot neither." Brantley responded, "No. Still n here bt way round the corner. I nd to move it sumwhere else tho." A few minutes later, Morris texted: "Yea just lean bak stay loyal." Brantley replied: "Of course... Til death do us part." In spite of this communication, there is no evidence that Brantley ever moved the vehicle after it was first parked.

As soon as the police arrived at the scene of the shooting, they found the video recording of the incident, the driver information provided by Brantley, and the name of Dontae Morris written on the note pad and still appearing on the computer screen. When the officers viewed the video at the scene, they both heard Morris identify himself to the officer and recognized him when he later stepped from the passenger side of the vehicle. Dontae Morris was well known to the officers in the Tampa Police department. He had been arrested many times and was known to be a felon.

After finding the dead officers, the police brought a bloodhound to the scene in an effort to track Morris. The dog was unable to find a scent to follow. The police also started canvassing the area and found Brantley and her car within a few hours of beginning the search, and about ten hours after the shooting. Although the police agree that Brantley had

not tried to clean the car or wipe it down, no attempt was made to capture a scent for the bloodhound.

It is not clear how the Tampa Police found Brantley in the apartment -- whether by canvassing each apartment or because she or someone came out to the parking lot and told them where she was. In any event, an officer on the scene questioned her for about three minutes. Brantley answered his questions except for the one asking for the name of her passenger. At that, she balked. She would not say the name "Dontae Morris," but she told the officer they knew who her passenger was and pointed to the name of Dontae Morris written on the officer's pad. In testifying at trial, the officer would not admit that he arrested Brantley at that point, but did acknowledge that he handcuffed her and took her to the Tampa Police station for questioning.

At the station Brantley was interrogated by the lead detective for almost six hours. She answered all of his questions except would not state the name "Dontae Morris." Brantley admitted driving the vehicle, being pulled over for no tag, having a passenger prior to the stop, an incident happening she thought caused injuries, and leaving the scene without a passenger. All of her answers were truthful.

The detective, knowing the identity of the perpetrator, showed her a photograph that he had obtained from one of Morris' relatives and asked Brantley to point to the person in the photograph that had been her passenger. She refused. She told them they already knew the identity of the perpetrator and she would not answer that particular question. The detective brought in Brantley's mother and grandmother, both of whom vigorously tried to

convince her to answer the one remaining question. Her mother even slapped Brantley in her efforts to get her to answer. Brantley refused.

The police found and arrested Morris within three days of the shooting. The State of Florida charged Morris with murder and has him in custody. The State did not choose to charge Brantley, but the federal government charged her with misprison of a felony.

A conviction for misprison of a felony requires proof beyond a reasonable doubt of the following four factors[1]:

(1) commission and completion of a felony offense by another;

(2) actual knowledge by defendant of the commission of such felony;

(3) failure by defendant to notify authorities; and

(4) an affirmative act by defendant to conceal the crime.

Brantley is charged with concealing, not the murder of the two police officers, but that a felon possessed a firearm.

Brantley's case went to trial on January 14, 2013. The difficult legal issue is whether Brantley committed an affirmative act to conceal the crime of "felon in possession of a firearm." The jury was presented with a verdict form containing two questions:

(1) whether the Defendant was guilty or not guilty; and

(2) if guilty, what affirmative act was committed by Defendant to conceal the crime.

---

[1] *U.S. v. Weekley*, 389 F. Supp. 2d 1293 (S.D. Alabama 2005).

The jury returned a verdict of guilty and, as to the second question asking them to "describe the act or acts you find Courtnee Nicole Brantley committed to conceal the crime of felon in possession of firearm or ammunition," stated:

> The defendant knowingly and willfully concealed her knowledge of the possession of a firearm and ammunition by a convicted felon from the authorities by coordinating via phone calls and text messages with Dantae Morris.[2]

The Court, realizing there was a problem with this finding as an act of concealment, called the lawyers to the bench to discuss the next step. It was agreed that the Court should ask the jury whether it wanted to be more specific or add any additional findings of concealment. The Court then instructed the jury to return to the jury room and deliberate whether they wished to be more specific about whether the act of concealment was just coordination, or if that coordination led to something else. The jury returned to the jury room and came back a few minutes later with no change in their finding of fact.

## DISCUSSION

Misprison of a felony is a rarely charged crime. When it is charged, the act of concealment is usually obvious, such as giving a ride to one known to have just robbed a bank,[3] or helping hide the loot.[4]

---

[2] Verdict, Dkt. #241, p. 2.

[3] *Weekly*, 389 F. Supp. 2d at 1293.

[4] *Lancey v. U.S.*, 356 F. 2d 407 (9th Cir. 1966).

Here the act of concealment is far from obvious. A natural first reaction to the facts of this case is that a failure to report the murder of two police officers is wrong. It is outrageous. And the one who fails to report must be guilty of something. While that reaction is natural, it is not the law. The failure to report such a heinous crime may be morally wrong, even reprehensible, but it is not illegal when to make such a report might implicate one's self in a crime.[5] A defendant's duty to report a known felony has to be reconciled with the Fifth Amendment privilege not to incriminate one's self.

Leaving the scene of a traffic stop without permission is a felony of the third degree.[6] Brantley could have been charged with that crime, and therefore had a right to remain silent. For that reason, Brantley's failure to cooperate does not constitute misprison of a felony.[7] Mere silence, without some affirmative act of concealment is insufficient.[8] And where a defendant answers some questions, but not all, that too fails to constitute misprison of a felony as long as the answers that are given are truthful.[9]

Had Brantley chosen to answer the one remaining question, she would have given the police the identity of the shooter, a fact they already knew, but nothing more. There was no evidence that she knew where Morris had gone, or where he was located at any time after the

---

[5] *U.S. v. King*, 402 F. 2d 694 (9th Cir. 1968).

[6] Florida Statute § 316.1935(1).

[7] *U.S. v. Davila*, 698 F. 2d 715, 717 (5th Cir. 1983).

[8] *U.S. v. Ciambrone*, 750 F. 2d 1416, 1418 (9th Cir. 1984).

[9] *Ciambrone*, 750 F. 2d at 418.

incident. But this circumstance does not help Brantley legally because the existing knowledge of the police is not an element of the crime. It does not matter what law enforcement already knew, only whether one charged with misprison of a felony has committed an affirmative act of concealment.[10]

As to the officers' encounter with Dontae Morris, there are no facts in the record showing Brantley had any knowledge Morris possessed a firearm prior to the shooting. When Officer Curtis looked through the driver side window to get information from Morris, he apparently did not see a firearm. When the two officers approached the passenger side of the vehicle and asked Morris to exit, there was no indication they saw a firearm. Therefore, there was no proof Brantley knew Morris possessed a firearm. And, at that point, there was certainly no showing she committed an affirmative act to conceal that Morris possessed a firearm. The Government did not argue to the contrary.

The Government argued that Brantley's first act of concealment was her leaving the scene of the traffic stop and "disturbing the scene." The flaw in this argument is one of proof -- the Government pointed to nothing at the scene that was disturbed that concealed anything material to the elements of the crime.

Next, the Government argued that when the investigating officers arrived at the scene, they called in a bloodhound to track the shooter because the video showed the shooter had left on foot. The Government contended that if the car was still at the scene, it may have

---

[10] *Lancey*, 356 F. 2d at 409-10.

been possible to absorb a scent with a piece of gauze placed on the passenger seat, which, if placed in a paper bag for five minutes, may have allowed the bloodhound to obtain a scent from the bag, and then, perhaps, the dog could have successfully tracked the shooter.

Not only is it a stretch of the imagination to believe that such a tracking process would have been successful, the necessary affirmative act of concealment must be committed with the intent to conceal. There was absolutely no evidence that Brantley intended to conceal that a felon possessed a firearm by removing the car from the scene. In its closing argument, the Government acknowledged Brantley's leaving the scene was in reaction to the horrifying events that had just transpired. There was no showing of any conscious deliberation that, by leaving, Brantley intended to conceal that a felon possessed a firearm by keeping her vehicle away from a bloodhound. The jury obviously gave no weight to the bloodhound argument.

What the jury did find was that the Defendant "concealed her knowledge of the possession of a firearm and ammunition by a convicted felon from the authorities by coordinating via phone calls and text messages with Dantae Morris." But talking with the perpetrator after the commission of a crime is not an act of concealment. Knowing where a perpetrator is hiding, having conversations with him, and even advising him about how to escape, is not sufficient alone to constitute the crime of misprison of a felony.[11] An intent to conceal from the Government that is not carried out is not an offense under the statute.[12]

---

[11] *Neal v. U.S.*, 102 F. 2d 643 (8th Cir. 1939).

[12] *Id.* at 650.

Thus, coordination through phone conversations and text messages, by itself, is insufficient to support a conviction. If this were a civil case, the jury's verdict would be set aside and judgment granted for Brantley as a matter of law.[13] But this is not a civil case -- it is a criminal case. In a criminal case, when a jury has returned a general verdict of guilty, the Court concludes it must go beyond the jury's finding of supporting fact and conduct an independent review of the sufficiency of all the evidence to determine if there is any fact that could support the verdict.[14]

---

[13] The Government argues the Court should never have submitted the special interrogatory to the jury in the first place, claiming it to be an invasion of the jury's deliberation. Special interrogatories to a criminal jury are, as a general rule, disfavored because such questions are thought to encourage a jury to find against a defendant. But the giving of a special interrogatory is certainly within the discretion of the Court, particularly in a close call on one of the elements of the crime. See the discussion of the use of a special interrogatory verdict in *U.S. v. Acosta*, 149 F. Supp. 2d 1073 (E.D. Wisconsin 2001).

[14] *U.S. v. Powell*, 105 S. Ct. 471 (1984). *Powell* is not directly on point -- it deals with inconsistent verdicts, not a finding of fact that fails to support the verdict -- but it is instructive. An inconsistent verdict is one in which a jury finds a defendant guilty of one count and not guilty on a predicate count. The Supreme Court in *Powell* re-affirmed the *Dunn* rule (*Dunn v. U.S.*, 284 U.S. 390 (1932)) that where inconsistent verdicts are reached, "[t]he most that can be said . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt." *Powell*, 469 U.S. at 64-65, quoting *Dunn*, 284 U.S. at 393.

In *Dunn*, the defendant was charged with three counts: Count 1 for maintaining a nuisance by keeping intoxicating liquor for sale, Count 2 for possession of that liquor, and Count 3 for selling it. The jury found the defendant guilty on Count 1, and not guilty on Counts 2 and 3. The jury could not have convicted on the nuisance count without finding that the defendant possessed, or sold intoxicating liquor, but the verdict was allowed to stand.

The *Powell* court stated a criminal defendant's protection against jury irrationality or error lies with an independent review of the sufficiency of the evidence by the court. "Sufficiency-of the evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilt beyond a reasonable doubt." *Powell*, 469 U.S. at 67.

The only evidence with the potential to support the verdict is that Brantley, upon reaching her friend's apartment, backed her car into a parking space at the opposite end of the complex. But if one accepts the parking of the car in this manner as an intent to conceal, what did Brantley intend to conceal? She left the crime scene in a panic. Did she intend to conceal herself from being charged in this horrific incident? If her sole intent was to conceal herself, that is not an act to conceal the crime that a felon possessed a firearm. Again, one cannot be convicted of misprison of a felony for refusing to make one's self available to provide information.

There are two other hypotheses as to Brantley's intent. The hiding of the car could also be interpreted to be an attempt to conceal Morris' involvement in the incident. If that was Brantley's intent, a reasonable jury could conclude that act was sufficient to support a finding of guilt. Another possibility, of course, is that Brantley intended to hide both herself and Morris.

Where evidence is equally consistent with each of several hypotheses, the law considers it proof of any one of them. And if any one of them supports a finding of innocence, the law affords a defendant the benefit of innocence.[15]

Thus, the question is whether a jury could find the evidence in this case supported a guilt hypothesis more than the innocence hypothesis. The jury relied on the phone and text messages to find Brantley guilty. Those messages could indicate to the jury that Brantley was aware that hiding the car was important, not just for herself but also for Morris. Morris

---

[15] *Neal*, 102 F. 2d at 648, citing *Prudential Ins. Co. v. King*, 101 F. 2d 990 (8th Cir. 1939), which explained the proposition in the negative: "Evidence which is consistent with each of two hypotheses proves neither."

clearly indicated to her his desire that the car "dont need 2 be park by the spot neither." She replied that it was not. It was "way round corner. I nd to move it sumwhere else tho." And she agreed to remain loyal. While the jury described these messages as "coordination," the jury could have accepted them as more supportive of the hypothesis that Brantley intended to conceal both herself and Morris from law enforcement and did so by attempting to conceal the car. If so, that would support the verdict of guilty.

Therefore, the Court concludes that, by the thinnest of legal threads, the jury's verdict is supported by the evidence.

It is **ORDERED AND ADJUDGED** that:

1. Defendant's Motion for Judgment of Acquittal (Dkt. #246) is terminated as moot.

2. Defendant's Amended Motion for Judgment of Acquittal (Dkt. #247) is DENIED.

3. Defendant's Motion for New Trial (Dkt. #248) is DENIED.

4. Defendant Courtnee Nicole Brantley is hereby adjudicated GUILTY.

5. Sentencing is scheduled before the undersigned on **MONDAY, APRIL 29, 2013, at 8:45 a.m.** in Courtroom #13A, U. S. Sam Gibbons Courthouse, 801 North Florida Avenue, Tampa, Florida 33602. Time reserved: Up to one (1) hour.

**DONE** and **ORDERED** in Tampa, Florida on February 6, 2013.

**Copies furnished to:**
Counsel/Parties of Record

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

S:\Even\2010\10-cr-298.acquit new trial.wpd